UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ALFREDO JAVIER LUNA,

                      Petitioner,                  Case No. 1:11-cv-1018

v.                                        Honorable Janet T. Neff

CARMEN D. PALMER,

                      Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving two terms of life imprisonment without parole, imposed by the Ottawa County Circuit Court on July 14, 2008, after a jury convicted Petitioner of two counts of first-degree murder, MICH. COMP. LAWS § 750.316(1)(a). In his *pro se* amended petition[1], Petitioner raises four grounds for habeas corpus relief, as follows:

    I.        [PETITIONER'S] CONVICTIONS FOR FIRST DEGREE MURDER VIOLATE DUE PROCESS AS THERE WAS INSUFFICIENT EVIDENCE AS TO EACH ELEMENT OF THE CHARGED OFFENSES.

    II.      [PETITIONER'S] RIGHTS TO CONFRONTATION AND A FAIR TRIAL WERE DENIED WHERE THE STATE TRIAL COURT REFUSED TO ALLOW PERTINENT CROSS EXAMINATION OF (1) JAILHOUSE INFORMANT, CHRISTOPHER SANCHEZ[,] AND (2) WITNESS SYLVIA GARCES.

---

[1]The Court ordered Petitioner to file an amended petition on October 13, 2011, and on November 22, 2011. (*See* Oct. 13, 2011 Order, docket #5; Nov. 22, 2011 Order, docket #7.) Instead of filing an amended petition, Petitioner filed a "corrected" petition, which the Court will refer herein as an amended petition. (*See* Corrected Pet., docket #12.)

III.   THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO ALLOW THE TAPES OF WITNESS GARCES' POLICE INTERVIEWS, WHICH DEMONSTRATED MULTIPLE INCONSISTENT STATEMENTS[,] TO BE ADMITTED AS IMPEACHMENT EVIDENCE.

IV.   [PETITIONER'S] RIGHTS TO DUE PROCESS AND EQUAL PROTECTION OF THE LAW WERE DENIED WHERE THE STATE TRIAL COURT REFUSED TO ORDER A COPY OF THE TRIAL TRANSCRIPTS TO BE PREPARED IN SPANISH.

(Am. Pet., docket #12, Page ID#126.)[2]

Respondent has filed an answer to the petition (docket #17) stating that the grounds should be denied because the grounds are without merit and/or procedurally defaulted. Upon review and applying the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA) standards, I find that Grounds I and IV are without merit and Grounds II and III are procedurally defaulted. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.   Trial Court Proceedings

Petitioner Alfredo Luna and his co-defendant, Santiago Jaime Leos (Leos), were charged with two counts of open murder, which included first-degree murder and the lesser offense of second-degree murder, in connection with the March 8-9, 1988, beating deaths of forty-one year-old Michael Osborne (Osborne) and nineteen year-old Michael VanEenenaam (VanEenenaam) at

---

[2]Although Petitioner did not include Ground III in his amended petition, he argues the merits of the Confrontation Clause sub-claim of Ground III in the brief attached to his amended petition. (*See* Br. to Am. Pet., docket #13, Page ID##163-164.) As a result, the Court will consider his Confrontation Clause sub-claim herein.

- 2 -

78 West Ninth Street (Ninth Street) in Holland, Michigan.  Petitioner and Leos were tried before one jury beginning May 8, 2008, and concluding on May 22, 2008.[3]

Ivan TenBrink, a Board member of the Holland Moose Lodge in 1988, testified that Leos and Osborne were in a homosexual relationship in 1988.  Both Leos and Osborne were also members of the Holland Moose Lodge.  Osborne, who worked at the Moose Lodge, usually spoke with his mother on the phone when he worked on Thursdays.  When Osborne did not show up on a Thursday and Osborne's mother called, TenBrink became worried.  TenBrink eventually filed a police report that Osborne was missing. (Tr. II at 101-05.)

Holland Police Officer David Pedersen confirmed that he received a missing persons complaint on March 16, 1988.  (Tr. II at 118.)  Pedersen interviewed Leos on March 16, 1988.  Leos stated that he was in a relationship with Osborne but claimed that Osborne found a new boyfriend named "Mike" and moved out of the apartment on March 8 or 9, 1988.  (Tr. II at 123.)  Leos mentioned that Osborne left Leos the furniture and a car that they had shared.  (Tr. II at 123, 125-26.)  Pedersen noted that the apartment Leos and Osborne shared was empty on March 16, 1988.  Leos went to live at his parents' house.  (Tr. II at 127.)

Virginia Velkly testified that she found two skeletons on September 25, 1988, while hunting with her family in the Allegan woods.  Velkly notified the police. (Tr. II at 132, 139.)

---

[3]The trial transcripts will be referred to as follows:
"Tr. I" - Trial Transcript Volume I, May 8, 2008 (docket #19)
"Tr. II" - Trial Transcript Volume II, May 13, 2008 (docket #21)
"Tr. III" - Trial Transcript Volume III, May 14, 2008 (docket #22)
"Tr. IV" - Trial Transcript Volume IV, May 15, 2008 (docket #23)
"Tr. V" - Trial Transcript Volume V, May 16, 2008 (docket #24)
"Tr. VI" - Trial Transcript Volume VI, May 20, 2008 (docket #25)
"Tr. VII" - Trial Transcript Volume VII, May 21, 2008 (docket #26)
"Tr. VIII" - Trial Transcript Volume VIII, May 22, 2008 (docket #27)
"Tr. IX" - Trial Transcript Volume IX, May 23, 2008 (docket #28).

Allegan County Deputy Sheriff Lon Hoyer testified that he responded to a call on September 25, 1988, about bodies in the Allegan game area. (Tr. II at 152-53.) Hoyer found the first body mainly intact, except for a missing hand. The body also had a garbage-type bag resting on its shoulders and neck. The second body was somewhat scattered. (Tr. II at 156, 158, 161.) The bodies were sent for dental identification. (Tr. II at 164-65.) On September 27, 1988, Roger Erbaugh, an expert in forensic dentistry, identified the two bodies as VanEenenaam and Osborne. (Tr. II at 181-82.)

After the identification, Allegan County Detective Rick Cain and Deputy Sheriff Hoyer interviewed Leos. (Tr. III at 51, 56-57.) Leos indicated that he had been involved with Osborne over the past six years but the relationship deteriorated when Osborne had an affair with a woman in 1985. Osborne also removed Leos from his Administrator position at the Holland Moose Lodge, and had VanEenenaam move into their apartment. (Tr. III at 58-59.) Leos last saw Osborne and VanEenenaam on March 7, 1988, at 5:00 a.m. before he left for work. When Leos returned, they had moved out but did not take any personal belongings. (Tr. III at 62.)

Holland Police Officer Geuder participated in the September 30, 1988 search of Leos' apartment as an evidence technician. (Tr. II at 225-28, 233.) Geuder found blood stains on the carpet and carpet pad in the living room. (Tr. II at 228-31, 233.) Geuder removed a portion of the carpet from the living room for further testing. (Tr. II at 236-37.)

Deputy Sheriff Lon Hoyer was recalled to testify about the search of Leos' parents' home on September 30, 1988. (Tr. II at 187-89.) In Leos' bedroom, Hoyer found two canceled checks drawn on Osborne's account and signed by Osborne. One was made out to Leos on August 15, 1988, and another was made out to 7-Eleven on August 17, 1988. He also found Osborne's check ledger and credit cards. In the basement's crawlspace, Hoyer removed fifteen to eighteen

- 4 -

framed pictures.  In addition, Hoyer found a white wicker chest with a brown spot on a latch.  (Tr. II at 190, 194-97.)

In 1988, Kevin Streeter, a serology expert, identified the presence of blood on the carpet pad and carpet from Leos' apartment, and the wicker basket and three picture frames found in Leos' parents' house.  (Tr. III at 115-18, 122-23, 126, 132.)

Dr. Stephen Cohle, an expert in forensic pathology, testified that VanEenenaam died from a blunt head injury.  Dr. Cohle stated that VanEenenaam had multiple fractures on his skull, a cracked scapula and a missing left hand. (Tr. III at 19, 22, 28.) Dr. Cohle thought that he was hit at least twice on the head.  As for Osborne, Dr. Cohle stated that he died from being beaten four or five times on the head with a heavy, blunt object.  Dr. Cohle testified that there was so much trauma to Osborne's skull that it fragmented into small pieces. (Tr. III at 26, 29, 34, 37-38.)

Holland Police Captain Matt Messer testified that this cold case reopened in February 2006 because of new technology and additional information from two witnesses, Tina Wyngarden and Sylvia Garces.  (Tr. III at 76-78.)  On September 22, 2007, Petitioner and Leos were charged with the murder of Osborne and VanEenenaam.  (Tr. III at 80.)

Paul Donald, an expert in DNA analysis, compared the DNA profile from the carpet pad to buccal swabs obtained from VanEenenaam's parents.  Donald found that he could not rule out the DNA sample came from a child of VanEenenaam's parents. (Tr. III at 149-50.)  Marco Scarpetta, an expert in human identity, testified that it was 66 trillion-fold more likely that the blood stain from the carpet sample was from a child of VanEenenaam's parents.  (Tr. III at 169-70.)

Todd Welch, an expert in document examination, reviewed the payee names and endorsements on check number 623 dated July 9, 1988, and check number 624 dated August 15,

1988, to Leos' writing and signature obtained from independent documents.  Welch testified that

Leos wrote the payee name and the endorsement on both checks.  (Tr. III at 196, 199-203, 207.)

Brenda Lozano testified that she knew Osborne because he dated her sister, Sue

Zuverink, in 1986 while Leos was in Texas.  When Leos returned, Zuverink and Osborne had to end

their relationship.  Leos told Lozano that if anyone messed with Osborne, Leos would kill him or her.

Osborne eventually moved in with Leos. (Tr. III at 222-28.)

Thomas Golladay married Leos' sister, Tina, in the 1980s.  While married, they

periodically lived at Tina's parents' house on 19th Street.  Golladay testified that Petitioner lived

behind Tina's parents' house and Leos and Petitioner knew each other.  (Tr. IV at 30-31, 33.)

Carmen Smith testified that she worked at the Holland Moose Lodge.  Smith testified

that Leos was very jealous of the relationship between Osborne and VanEenenaam. (Tr. IV at 73-76,

79.)  Smith witnessed Leos thrust a knife at Osborne's hand, while saying, "[m]otherfucker, I'll see

you dead and rotting in hell."  (Tr. IV at 87-89.)  Smith remembered that Osborne went missing on

a Wednesday because he did not bring bingo supplies to the Moose Lodge.  Smith also did not see

VanEenenaam after Osborne went missing.  In March 1988, Leos mentioned to Smith that Osborne

went to Canada.  (Tr. IV at 80, 82-83.)  Smith also testified that Leos said he could hide a body and

get away with it because Leos had the Holland Police Department in his back pocket.  (Tr. IV at 94.)

Donald Taylor, the Michigan Deputy Supreme for the Loyal Order of Moose, testified

that he became involved with the Holland Moose Lodge when they were having problems in 1988.

On February 9, 1988, Taylor, President of the Michigan Moose Association James Grahl, Osborne

and Leos met at the Moose Lodge because Leos was being removed as Administrator.  Osborne was

replacing Leos as the new Administrator.  (Tr. IV at 121-34.)  Leos was very angry at Osborne and

Osborne eventually walked out of the meeting.  Leos told Taylor and Grahl that "I missed [Osborne] the first time, but the next time I'll kill the son of a bitch."  (Tr. IV at 131-32.)  Grahl corroborated Taylor's testimony.  Grahl testified that Leos was mad because Osborne had found a new boyfriend. (Tr. IV at 140, 144-45.)

Sheryl Wilson testified that she worked at the Holland Moose Lodge.  At times, Leos would cut her hair.  (Tr. IV at 149, 156.)  On Saturday, March 5, 1988, Wilson arrived at Leos' apartment at 10:30 a.m. for a hair appointment.  Leos was upset that morning because he had caught Osborne and VanEenenaam in bed together.  (Tr. IV at 156-59.)  The following week, Leos mentioned to Wilson that Osborne and VanEenenaam went to Texas on vacation.  (Tr. IV at 162-64.)

Patricia Lowden testified that she was a member of the Holland Moose Lodge.  In 1984-85, Lowden would drink with Leos in the Allegan woods area.  Lowden met VanEenenaam through Leos and Osborne at the Moose Lodge.  (Tr. IV at 191-95.)  On one occasion at the Ninth Street apartment, Lowden witnessed Leos threaten Osborne with a gun for sleeping with VanEenenaam.  Osborne got the gun away from Leos.  (Tr. IV at 199-204.)

On March 5, 1988, Lowden noticed that Leos was upset.  Leos told Lowden that he caught Osborne and VanEenenaam in bed together.  Leos stated that they both had to die.  (Tr. IV at 208-09.)  In the summer of 1988, Lowden asked Leos if he had seen Osborne and VanEenenaam. Leos stated "Don't worry about them.  They are well taken care of, and you will probably never see them again."  (Tr. IV at 212.)

Lois Stevens bartended at the Holland Moose Lodge in 1988.  One night, before Osborne went missing, Stevens noticed Leos and Petitioner talking at the end of the bar.  Since they

did not have any drinks, Stevens approached them to see if they needed drinks.  Stevens overheard Petitioner tell Leos that he could take care of the problem for enough money.  (Tr. IV at 258, 264.)

Thelma Hicks, a member of the Holland Moose Lodge in 1988, knew Leos was jealous of the relationship between Osborne and VanEenenaam.  (Tr. V at 6, 9.)  On several occasions, Leos threatened to kill Osborne if he caught him cheating.  Hicks noted Osborne missing when he did not show up to bring supplies on a Tuesday or Wednesday night.  (Tr. V at 11-14.)  Once the bodies were found, Hicks told Leos that she thought he had something to do with the bodies.  Leos replied, "you can't prove anything, and neither can the police."  (Tr. V at 16-17.)

Dennis Fuglseth, a Board member at the Holland Moose Lodge, testified that he was not happy with how the club was being run by Leos, as Administrator.  When Leos was replaced by Osborne, Leos appeared betrayed.  (Tr. V at 28-32.)  Fuglseth noticed a lover's triangle between Osborne, VanEenenaam and Leos.  Leos was not happy that Osborne was hanging around VanEenenaam.  Fuglseth last saw Osborne at a Tuesday Board meeting.  Fuglseth was going to meet Osborne the next day to help unload some bingo supplies.  Prior to Osborne's disappearance, Fuglseth heard Leos say that he was going to kill Osborne.  (Tr. V at 34-36, 38.)

Tony Ayala testified that he knew Petitioner, Leos, Tom Golladay, Sylvia Garces and a woman named Mariana.  (Tr. V at 47-49.)  On Tuesday, March 8, 1988, Ayala testified that he was drinking with Petitioner and Leos at the Holland Moose Lodge.  Ayala overheard Petitioner and Leos talk about taking care of a problem.  (Tr. V at 61-64.)  When Ayala asked about the problem, Petitioner told him not to worry about it. Around midnight, Petitioner drove everyone and an unidentified "white dude" to Leos' apartment.  (Tr. V at 65.) Ayala noticed a miniature baseball bat next to Petitioner in the car.  Ayala asked Petitioner what it was for but Petitioner would not tell him.

After they arrived, Ayala, Petitioner and Leos smoked a joint outside.  Once they finished, they went into the living room of the apartment.  Osborne, VanEenenaam and the "white dude" were also in the house.  Ayala testified that Garces and Mariana arrived a little later.  (Tr. V at 66-71, 73.)

While in the living room, Leos told Osborne that he wanted to talk.  Osborne said that he did not want to talk and walked away from Leos.  (Tr. V at 71-72.)  Ayala saw Leos grab a "mace from the wall with a ball and chain" and start hitting Osborne in the back of the head as he walked away.  (Tr. V at 72, 81-82.)  Osborne fell to the ground and VanEenenaam moved to stop Leos.  Petitioner, however, grabbed VanEenenaam and threw him to the ground.  Leos continued to hit Osborne while Osborne was on the ground.  (Tr. V at 82, 84.)  Petitioner grabbed the "rolling pin or baseball bat" from his pants and starting hitting VanEenenaam on the head.  (Tr. V at 84.)  Petitioner was saying "Andale punto," translated to, "there you go, you fucking faggot."  (Tr. V at 84-85.)  VanEenenaam covered his head with his hands and tried to get back on his feet but he could not.  Petitioner hit VanEenenaam four to six times on his head and body.  At this time, Leos was hitting Osborne's face with the mace.  Eventually, Leos dragged Osborne into a bedroom and continued to hit him.  (Tr. V at 85-89.)  Leos said, "I hope you learned your lesson, you fucking bitch."  (Tr. V at 89.)  Ayala testified that he saw blood on the back of Osborne's head and blood fly off of the weapon.  Ayala thought the beatings lasted fifteen to twenty minutes.  Neither Osborne nor VanEenenaam fought back.  (Tr. V at 90-94.)

During the beatings, Garces and Mariana screamed from the kitchen.  The "white dude" ran off.  (Tr. V at 94.)  Ayala witnessed both Osborne and VanEenenaam bleeding from their heads. Ayala also saw blood spatters on the wall and a lot of blood on the carpet.  When the beatings stopped, VanEenenaam and Osborne were on the living room and bedroom floors, respectively.  (Tr.

- 9 -

V at 94, 96-97.) Leos moved Osborne's body to the kitchen, grabbed a knife and cut off Osborne's hand. Petitioner and Leos then put carpet on the kitchen floor. Petitioner and Leos covered Osborne's body with a large plastic bag, rolled Osborne into the carpet and brought him to the trunk of Ayala's car. (Tr. V at 98-103.) Petitioner and Leos also dragged VanEenenaam to the kitchen, placed a plastic bag around his body and rolled him up in another carpet. Mariana, Garces and Ayala cleaned up the blood. (Tr. V at 101-07.)

Eventually, Petitioner drove Leos, Ayala, Mariana and Garces in Ayala's car with the bodies in the trunk. Ayala asked Leos why he did it. Leos responded that Osborne was cheating on him. (Tr. V at 109-10.) Ayala thought Osborne and VanEenenaam were dead because they were not moving when they were placed into the carpet. After midnight, they arrived at the Allegan woods. Petitioner and Leos dragged the bodies one at a time into a wooded area. (Tr. V at 111-12.) Ayala did not help move the bodies but talked to Garces and Mariana in the car. Ayala was scared. After about twenty minutes, they left the Allegan woods. (Tr. V at 115.)

On the drive back, Ayala heard Petitioner say "I hope you're happy this is done and over with." (Tr. V at 117.) Leos with a big smile, replied "Oh yeah, very happy." (Tr. V at 118.) Petitioner gave Ayala weed and beer to keep him quiet. Ayala testified that he did not initially tell the truth to the police because he was scared. Ayala also noted that Petitioner and his wife had an affair but he did not find out about it until after his divorce in 1995. (Tr. V at 122-24.)

Patricia Lockard testified that she owned a house at 78 West Ninth Street in 1988. The house had three apartments. Leos and Osborne rented the first-floor apartment under a one-year lease. They moved in July 10, 1987. A couple weeks before Osborne went missing, Lockard received notice that they would be moving out of the apartment. (Tr. V at 243-47.) After they

moved out, Lockard went to the apartment to clean.  She found blood splatters in the bathroom, on the bathroom walls, in the living room and on the steps to the kitchen.  (Tr. V at 250-53, 258.) Lockard stated that she had stored old carpet in the basement of the apartment.  (Tr. V at 262-63.)

William McGrath, the Administrator of the Wyoming Moose Lodge in 1988, knew Osborne when he became the Administrator of the Holland Moose Lodge.  Osborne would bring Leos to the Wyoming Moose Lodge.  (Tr. V at 270-72.)  In May 1988, McGrath saw Leos at the Wyoming Moose Lodge and asked about Osborne.  Leos replied that the Holland police believe "I killed him."  (Tr. V at 278-79.)  Although Leos said that he did know where Osborne was, he mentioned that "they're not going to recognize him when they find him."  (Tr. V at 279.)

Jacqueline Westenbroek, assistant manager of Dial-A-Ride, hired Leos in February or March 1988.  (Tr. V at 285-89.)  According to the work log, Leos worked on Monday, March 7, and Tuesday, March 8, from 5:45 a.m. to noon.  Leos, however, did not work on Wednesday, March 9, and left early on Thursday, March 10.  On March 10, Leos was upset because Osborne and the Cadillac were gone.  (Tr. V at 291-94.)  Leos later mentioned that "wouldn't it be a [] hoot if they [] found him in the Allegan [w]oods with bags over their head?"  (Tr. V at 297.)

Debra McGonegal, Osborne's sister, testified that Leos called her around March 12, 1988.  Leos mentioned that Osborne was missing along with his car.  (Tr. VI at 14.)

Sylvia Uvalle, formerly known as Sylvia Garces (Garces), testified that she partied with Petitioner and Tony Ayala.  Garces had a short intimate relationship with Petitioner.  (Tr. VI at 23-25.)  Garces testified that Petitioner and Leos also had a sexual relationship.  (Tr. VI at 27-28.)

On March 8, 1988, Garces was at Leos' apartment on Ninth Street.  Garces saw Petitioner and Ayala go into the house but she stayed outside with Leos and Mariana.  Shortly after,

- 11 -

Leos went inside.  Garces and Mariana entered the kitchen.  (Tr. VI at 29-32.)  While in the kitchen, Garces witnessed Petitioner, Ayala and Leos arguing with the others who lived there.  Petitioner then started hitting a young man with a ball and chain on the man's head.  (Tr. VI at 34-36.)  Blood splattered on the wall and floor.  The young man grabbed Petitioner's legs and asked him to help. Petitioner, however, kept hitting him.  Petitioner said that he was going to teach him who was boss. (Tr. VI at 36, 38.)  Garces testified that she also saw Petitioner hit the younger one with brass knuckles that he removed from the car.  (Tr. VI at 54-55.)  Garces observed Leos hit the older man two or three times with something that looked like a small baseball bat.  Leos told the older man to get off the "motherfucker."  (Tr. VI at 38.)  The older man eventually fell down.  Ayala also hit one of the victims with his hand. (Tr. VI at 37-41, 43.)

Garces was very scared.  Both men were bloodied on the floor and not moving. Garces also saw blood on the carpet next to the younger man and on the walls.  Petitioner told them to start cleaning up.  (Tr. VI at 44-46, 48.)  Garces, Mariana and Ayala cleaned up the blood and then Garces and Mariana sat in Ayala's car.  Garces heard them bring the bodies out to the car.  Petitioner put the first body in the trunk.  Ayala and Leos then carried out the second body.  Garces noticed that the bodies were covered in carpet and black bags.  (Tr. VI at 49-53.)  Garces thought the men were dead because they did not move.  Petitioner drove to the woods. When they stopped, Petitioner, Ayala and Leos removed the bodies from the car.  Garces and Mariana stayed in the car. (Tr. VI at 55-58.) Garces did not tell the whole story at first because she was threatened.  (Tr. VI at 60-61.)

John Towne, Jr., testified that in June or July 1988, he lived with Leos at his parents' house.  (Tr. VI at 180-81.)  Leos introduced Towne to Tony Ayala and "El Jefe," a nickname for Petitioner.  (Tr. VI at 188-89.)  Towne testified that the first time that Leos mentioned Michael was

at Leos' parents' house. After drinking, Leos mentioned how "Michael and Michael" were murdered. (Tr. VI at 193.) Leos told Towne that "Michael was cheating with another guy named Michael" and Leos caught them at his house. Leos mentioned that they drugged him and beat him with something like a police stick. Towne saw the stick in Leos' parents' basement because Leos had a shrine to Michael there. (Tr. VI at 196-98.) Leos told Towne that the bodies of Michael and Michael were taken to the Allegan woods. Towne testified that Leos told him that they cut off the Michael's lover's hand. Towne received four pounds of marijuana from Leos' brother, Jay Stewart, to help find the bodies. Towne was supposed to find and re-bury the bodies without telling them where the bodies were located. On three different occasions, Petitioner, Stewart, Leos and Towne went to look for the bodies in the Allegan woods but did not find them. (Tr. VI at 200, 205-13.)

Towne came forward with this information in 1991 because he was charged with uttering and publishing and wanted a deal. However, the information did not help reduce his sentence. In 2006, Towne agreed to cooperate again for the sake of the families. (Tr. VI at 214-17.)

Tina Wyngarden testified that Leos is her older brother. In 1988, Wyngarden was married to Tom Golladay. (Tr. VII at 22, 24 26.) Wyngarden knew of Tony Ayala and Petitioner because they were friends with Golladay and lived behind Wyngarden's parents' house. (Tr. VII at 27-29.) Wyngarden noticed that Leos and Osborne were fighting in early 1988 because Leos thought Osborne was sleeping with VanEenenaam. Wyngarden heard Leos say that he was going to kill Osborne. (Tr. VII at 32, 36-39.) The weekend before Osborne went missing, Wyngarden went to Leos' apartment to see if Osborne and Leos would babysit her children. She found Leos and VanEenenaam fighting. Leos wanted VanEenenaam to move out but VanEenenaam refused and

called Osborne.  Osborne eventually came to the apartment.  Osborne told Leos that VanEenenaam

was not going anywhere because Osborne paid rent.  Wyngarden then left.  (Tr. VII at 41-44.)

   The following Tuesday or Wednesday, Wyngarden ran into Leos at their parents'

house.  Leos said that Osborne and VanEenenaam ran away together and Osborne was never coming

back.  Wyngarden reached into the glove box for a tissue but found Osborne's checkbook.  (Tr. VII

at 51-52.)  Wyngarden asked Leos why Osborne did not take his car.  Leos claimed that Osborne told

him that he could have the car.  Leos also mentioned that he had a dream that Osborne was in a field

with his head bashed in.  Leos said that Osborne was never coming back.  (Tr. VII at 54-56.)  Later,

when Leos was living at his parents' house, Wyngarden noticed that Leos had Osborne's canceled

checks and a cardboard box of Osborne's belongings.  (Tr. VII at 57-59.)

   Christopher Sanchez testified that he met Petitioner while in jail in 1991.  They were

in a cell with Salvador Diaz, who later died.  (Tr. VII at 130-31, 139.)  When Sanchez teased

Petitioner about being the boyfriend to a feminine-acting inmate, Petitioner said that he killed or beat

up two whores and left them to die in the woods.  (Tr. VII at 135-37.)  Sanchez heard Petitioner talk

to Diaz about it while pretending to be asleep.  (Tr. VII at 139-40.)  Petitioner, again, stated that he

and his friends "fucked two male whores" and left them to die in the woods.  (Tr. VII at 142.)

Petitioner mentioned that Jaime, Tony and Louie were involved.  Petitioner said they were hired by

Jaime for $1,000 because somebody had caught somebody cheating.  Sanchez testified that he did

not know anything about two homosexuals from Holland being killed.  (Tr. VII at 143-45.)

   Sanchez next saw Petitioner in jail in February 2008.  (Tr. VII at146.)  Petitioner

mentioned that he was in jail for those "dos putos."  (Tr. VII at 151.)  Petitioner told Sanchez to keep

his mouth shut.  Sanchez felt that Petitioner was trying to intimidate him.  Sanchez testified that he

did not know anything about this case. (Tr. VII at 151-52.) Sanchez mentioned that he came forward with this information on his own volition. Sanchez was facing charges of first-degree criminal sexual conduct (CSC) and of two counts of third-degree CSC. (Tr. VII at158-59.) For his testimony, Sanchez would receive a three-year sentence and the first-degree CSC charge and one of the third-degree CSC charges would be dropped. Sanchez testified that Petitioner harassed him and his brother because of his testimony. (Tr. VII at 160-63.)

Patricia Lowden was recalled to testify about being a confidential informant. Lowden re-established contact with Leos by getting a job at the same place Leos worked. On August 30, 2006, Lowden ran into Leos at work. (Tr. VII at 255-57; Tr. VIII at 7.) Leos told her that he already served time for the murders of Osborne and VanEenenaam but was released because they determined drug dealers killed both of them. (Tr. VII at 258.) However, on February 28, 2007, Leos said he beat "him" with a pool stick and cut his hands off. (Tr. VII at 265.)

After the prosecution rested, Leos called four defense witnesses. (Tr. VIII at 45-68.) Petitioner did not call any defense witnesses. (Tr. VIII at 73.)

At the conclusion of trial, on May 23, 2008, the jury found Petitioner and Leos guilty of the first-degree murder of Michael Osborne and Michael VanEenenaam. (Tr. IX, 36.) On July 14, 2008, Petitioner was sentenced to serve a term of life without parole. (Sentencing Tr. at 11-12, docket #29.)

### B.    Direct Appeal

On March 30, 2009, Petitioner filed a motion to have his trial transcripts translated into Spanish. (*See* Def.'s Mot., docket #30.) The trial court denied Petitioner's motion. (*Id*. at 10.)

Petitioner then appealed as of right to the Michigan Court of Appeals along with Leos. Petitioner's brief, which was filed by counsel on April 21, 2009, raised the following five grounds for relief:

I.  THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A DIRECTED VERDICT, [PETITIONER'S] CONVICTIONS MUST THEREFORE BE REVERSED BECAUSE THERE IS INSUFFICIENT EVIDENCE OF (1) IDENTITY AND (2) PREMEDITATION / DELIBERATION TO SUSTAIN [PETITIONER'S] CONVICTION OF FIRST-DEGREE MURDER.

II.  THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND VIOLATED [PETITIONER'S] RIGHT OF CONFRONTATION AND RIGHT TO A FAIR TRIAL BY REFUSING TO ALLOW PERTINENT CROSS-EXAMINATION OF THE JAILHOUSE INFORMANT, CHRISTOPHER SANCHEZ, AND WITNESS SYLVIA GARCES.

III.  THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO ALLOW THE TAPES OF WITNESS GARCES' POLICE INTERVIEWS, WHICH DEMONSTRATED MULTIPLE INCONSISTENT STATEMENTS TO BE ADMITTED AS IMPEACHMENT EVIDENCE.

IV.  THE TRIAL COURT'S REFUSAL TO ORDER A COPY OF THE TRANSCRIPT TO BE PREPARED IN SPANISH VIOLATED [PETITIONER'S] RIGHT TO DUE PROCESS AND EQUAL PROTECTION.

V.  THIS COURT SHOULD ALLOW [PETITIONER] TO ADOPT ALL ARGUMENTS MADE BY THE CO-DEFENDANT WHICH AFFECT HIM, SO AS TO PROMOTE APPELLATE EFFICIENCY AND AVOID INCONSISTENT RESULTS.

(*See* Def.-Appellant's Br. on Appeal, docket #31.)  By unpublished opinion issued on February 16, 2010, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's and Leos' convictions and sentences.  (*See* Feb. 16, 2010 Mich. Ct. Appeals' Op. (MCOA Op.), docket #31.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same five claims, which were raised before and rejected by the Michigan

Court of Appeals.  (*See* Def.-Appellant's *Pro Per* Appl. for Leave to Appeal, docket #32.)  By order

entered June 28, 2010, the Michigan Supreme Court denied his application for leave to appeal

because it was not persuaded that the questions presented should be reviewed.  (*See* June 28, 2010

Mich. Order, docket #32.)

Petitioner only raises Grounds I, II, III and IV in his amended application for habeas

corpus relief.  (Am. Pet., docket #12, Page ID#126; Br. to Am. Pet., docket #13, Page ID##163-64.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for

writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot

be granted with respect to any claim that was adjudicated on the merits in state court unless the

adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law as determined by the Supreme Court of the United

States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts

in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme

Court.  28 U.S.C. § 2254(d).  The Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v.

Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Moreover, "clearly established Federal law" does not

include decisions of the Supreme Court announced after the last adjudication of the merits in state

court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). "In *Greene*, the Court clarified that state courts must follow clearly established law as it existed 'at the time of the state-court adjudication on the merits.'" *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014). "That is, under 28 U.S.C. § 2254(d), 'clearly established Federal law' is the law at the time the original decision was made, not as [the Sixth Circuit had previously held], the law 'before the conviction became final.'" *Miller*, 642 F.3d at 644 (quoting *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth by the Supreme Court, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–406). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011)).

- 18 -

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Richter*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).   The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.      Ground I:  Sufficiency of the Evidence

In his first ground for habeas corpus relief, Petitioner argues that the prosecutor failed to present sufficient evidence to sustain his convictions for the first-degree premeditated murder of Michael Osborne and Michael VanEenenaam.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).  Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis*

*v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir.

2008)).

The Michigan Court of Appeals rejected Petitioner's claim of insufficiency of the

evidence, stating:

> Defendant Luna first argues that the evidence presented at trial was
> insufficient to support his convictions because the proofs failed to show identity or
> premeditation. We disagree. We review claims of insufficient evidence de novo.
> *People v Cline*, 276 Mich App 634, 642, 741 NW2d 563 (2007). In doing so, we
> must view the evidence in the light most favorable to the prosecution and determine
> whether a rational trier of fact could find that all the elements of the crimes alleged
> were proven beyond a reasonable doubt. *Id.* Circumstantial evidence, and the
> inferences drawn therefrom, may be sufficient to establish a crime's elements.
> *People v Abraham*, 234 Mich App 640, 656, 599 NW2d 736 (1999). In evaluating
> this claim, this Court will not disturb the trier of fact's role in determining the weight
> of the evidence or in assessing the credibility of the witnesses. *People v Passage*,
> 272 Mich App [175], 177, 743 NW2d 746 (2007).
>
> In this case, Luna was charged and convicted of two counts of first-degree
> murder. "The elements of [first-degree] premeditated murder are (1) an intentional
> killing of a human being (2) with premeditation and deliberation." *People v
> Gayheart*, 285 Mich App 202, 210; ——— NW2d ——— (2009); MCL 750.316(1)(a).
> "[P]remeditation and deliberation characterize a thought process undisturbed by hot
> blood." *People v Plummer*, 229 Mich App 293, 301, 581 NW2d 753 (1998) (citation
> omitted). For there to be premeditation and deliberation, "sufficient time must have
> elapsed to allow the defendant to take a 'second look.'" *Id.* (citation omitted).
> "Premeditation and deliberation may be established by evidence of (1) the prior
> relationship of the parties; (2) the defendant's actions before the killing; (3) the
> circumstances of the killing itself; and (4) the defendant's conduct after the
> homicide." *Abraham, supra* at 656, 599 NW2d 736 (citation and quotation marks
> omitted). Further, a defendant's identity is an element of every crime. *People v Yost*,
> 278 Mich App 341, 356, 749 NW2d 753 (2008).
>
> Here, Luna and Leos were friends who partied together. Sometime in early
> 1988, Leos became angry because his boyfriend, Osborne, was sleeping with
> VanEenenaam. On numerous occasions, Leos directed threats at Osborne, indicating
> that he was going to kill him. Before the deaths of Osborne and VanEenenaam, an
> acquaintance at the Moose Lodge overheard a conversation between Luna and Leos,
> in which Luna stated that he could take care of the problem for money. Later, on the
> night of March 8, 1988, two witnesses saw Leos and Luna bludgeon Osborne and

VanEenenaam on their heads repeatedly.  The group had driven together from the Moose Lodge to the house on Ninth Street.  Apparently, just before heading over to the house, Ayala overheard Luna and Leos talking and saying that they were going to "take care of business."  When the group arrived at the Ninth Street home, Ayala asked Luna why he had the "rolling pin" type weapon, to which Luna was unresponsive.  Once inside, Leos attacked Osborne first while he was turned away.  Luna prevented VanEenenaam from helping Osborne by throwing him onto the ground and by beating him on the head with the "rolling pin," which he had brought from the car.  Defendants went and got carpets, rolled the bodies in them, put them in the trunk, and dumped them in the woods that same evening in order to hide them.  Subsequently, Luna admitted to his cellmates that he had "f——d two faggots and left them in the woods to die" and had been paid $1000 for his involvement by Leos.  This evidence, when viewed most favorably to the prosecution, sufficiently establishes the elements of first-degree murder.

(MCOA Op. at 7-8.)

As to the issue of premeditation and deliberation, the Court of Appeals held the following:

This certainly is not a case where the homicides occurred impulsively or "during a sudden affray."  *See People v Tilley*, 405 Mich 38, 44–45, 273 NW2d 471 (1979).  Rather, contrary to Luna's argument on appeal, the evidence establishes that Luna acted with premeditation and deliberation and was not merely acting negligently or impulsively.  Luna was overheard telling Leos that he could him take care of his "problem" for the right amount of money.  Further, on the night of the incident, Luna was overheard referencing whether Leos was ready to take care of "business."  Luna then arrived at the Ninth Street residence with a club-like weapon.  During the attack, Luna dealt repeated blows to his victim without hesitation once the attack began.  Certainly, sufficient time elapsed during which Luna could have taken a "second look."

(*Id.* at 8.)

The Michigan Court of Appeals further found that Petitioner's identity was sufficiently established:

We also disagree with Luna's argument that his identity was not sufficiently established at trial because the witnesses establishing his identity were inherently incredible.  Both [Garces] and Ayala identified Luna as the individual who beat VanEenenaam and helped Leos dump the bodies in the woods.  While both [Garces]

- 22 -

and Ayala's testimonies were impeached to some extent on cross-examination, our review of the record reveals that their testimonies were not impeached to the extent that their testimonies could not be reasonably believed. *See People v Lemmon*, 456 Mich 625, 643–644, 576 NW2d 129 (1998). Rather, during direct and cross-examination, both these witnesses explained the rational reasons why they had previously provided investigators with false statements. Thus, the testimonies of Ayala and [Garces] were not so inherently incredible as to be unbelievable and this Court will not usurp the jury's role of weighing the evidence and assessing the credibility of the witnesses in such instances. *People v Harrison*, 283 Mich App 374, 378, 768 NW2d 98 (2009).

Accordingly, we conclude that the evidence, when viewed most favorably to the prosecution, sufficiently supports Luna's two convictions for intentionally killing another human being with premeditation and deliberation. Thus, there is no merit to Luna's related argument that the trial court erred by denying his motion for directed verdict, as that motion was based on the allegedly insufficient evidence.

(*Id*.)

In his pleadings, Petitioner argues that witnesses Tony Ayala's, Sylvia Garces' and Christopher Sanchez's testimony are not worthy of belief. (*See* Br. to Am. Pet., docket #13, Page ID##154-56; Pet'r's Reply to Resp't's Answer, docket #34, Page ID##251-52.) As the *Jackson* Court recognized, the resolution of conflicting evidence and the assessment of witness credibility is reserved for the jury. *See Jackson*, 443 U.S. at 319. In this case, the jury resolved those issues against Petitioner. Moreover, the Michigan Court of Appeals found that the prosecution presented sufficient evidence at trial for the jury to conclude that the elements of premeditation and deliberation and identity had been proven beyond a reasonable doubt, a determination entitled to double deference under the AEDPA. *Davis*, 658 F.3d at 531. Applying that deference, I find that the appellate court's decision properly applied the facts of the case to the elements of the charged offenses, as required by *Jackson*. Those findings are supported by the record. Lois Stevens heard Petitioner say that he would take care of Leos' problem for money at the Holland Moose Lodge. (Tr.

- 23 -

IV at 258, 264.)  While in jail, Petitioner told Christopher Sanchez that he received $1000 for the

killings.  (Tr. VII at 143-45.)  Both Tony Ayala and Sylvia Garces, who were present at Leos' and

Osborne's apartment on the night of the killings, testified that Petitioner beat VanEenenaam and

Leos beat Osborne for fifteen to twenty minutes until they stopped moving.  They then dumped the

bodies in the woods.  (Tr. V at 82, 84, 111-12; Tr. VI at 34-41, 55-58.)  The physical evidence was

consistent with Ayala's and Garces' account.  Dr. Cohle, a forensic pathologist, confirmed that both

VanEenenaam and Osborne died from blunt head trauma.  (Tr. III at 19-34.)  Consequently, the

decision of the Michigan Court of Appeals was not an unreasonable application of *Jackson*.

## II.  Grounds II & III:  Confrontation Clause

In his second and third grounds for habeas corpus relief, Petitioner argues that he was

denied his right to effectively cross-examine two witnesses, Christopher Sanchez and Sylvia Garces,

and denied his right to impeach Sylvia Garces with prior inconsistent statements, respectively, in

violation of the Confrontation Clause.  Petitioner raised his claims on direct appeal, but the Michigan

Court of Appeals found the issues unpreserved for appellate review because Petitioner failed to make

contemporaneous objections.

Applying plain error review, the Michigan Court of Appeals denied Petitioner's

Confrontation Clause claims regarding the cross-examination of Christopher Sanchez and Sylvia

Garces, as follows:

> Luna first posits that the trial court erred by denying the admission of certain
> testimony that defense counsel attempted to elicit on cross-examination.
> Specifically, Luna contends that the trial court's rulings as to witnesses Sanchez and
> [Garces] prohibited him from advancing a line of questioning thereby violating his
> right to confrontation.  We disagree.  Because Luna did not object to the court's
> rulings on confrontation grounds below, our review is for plain error effecting

defendant's substantial rights.  *People v McPherson*, 263 Mich App 124, 138, 687 NW2d 370 (2004).

* * *

### a. Witness Sanchez

Here, Sanchez testified on direct examination that he was currently facing a pending criminal charge for several counts of criminal sexual conduct and that he had been offered a plea bargain in exchange for his testimony against Luna.  On cross-examination, the following colloquy occurred between defense counsel and Sanchez:

> Q.    Now you've indicated that you came forward because if something had happened to your children you would want people to come forward?
>
> A.    That is correct.
>
> Q.    You wouldn't want something bad to happen to anybody's child, would you?
>
> A.    No.
>
> Q.    Well, isn't it true that you, what you're charged with—
>
> Prosecutor.    Objection, Your Honor.

The trial court sustained the prosecutor's objection, apparently agreeing with the prosecutor that Sanchez's answer as to the facts of his case would not be relevant to the present matter and that delving into such matters could violate Sanchez's right against self-incrimination.  Luna did not challenge the prosecutor's assertion that the inquiry could implicate Sanchez's Fifth Amendment rights.

We see no error in the trial court's decision.  Preventing cross-examination as to the factual details of the charges pending against Sanchez was a reasonable limitation on Luna's right to cross-examine the witness, as such an inquiry could, as the prosecutor argued, implicate Sanchez's right against self-incrimination.  Further, we simply fail to see how such details would be relevant to demonstrating the witness's bias and defendant has not offered any explanation on appeal.  In any case, defense counsel was still able to question Sanchez about the charges pending against him and the circumstances surrounding his plea agreement.  Even the prosecutor made it clear on direct examination that Sanchez had an interest in testifying about

Luna's statements in exchange for a more favorable plea agreement. As such, evidence of Sanchez's motive to testify against Luna was made clear to the jury. Thus, even assuming for the sake of argument that the court's decision had been erroneous, it was therefore harmless.

### b. Witness [Garces]

Luna also argues that he was improperly denied his right to confront [Garces] on cross-examination. We disagree.

Here, defense counsel asked [Garces] whether she had charges "pending" during the re-opened investigation. Counsel stated, "In January of 2007, you had charges pending of possession of a financial transaction device, didn't you?" The prosecutor objected to defense counsel's use of the word "pending" on the grounds that it suggested to the jury that she was offered a benefit in her case when, according to the prosecutor, she had never been offered a benefit. Defense counsel countered that it was necessary to show that she had been offered a benefit. The trial court sustained the objection "to the question as it is asked." Defense counsel then went on to question [Garces] about her conviction but never asked her whether she received a sentencing deal or other benefit as a result of her cooperation in this case.

Again, we fail to see any error. Luna's right to confront [Garces] was not limited in any meaningful way. Counsel was merely prevented from asking whether she had a charge "pending" during the investigation. Counsel was not otherwise prevented from attempting to reveal that [Garces] was biased or had a motive to testify against defendants because she may have been provided a benefit in her own case. Rather, counsel simply chose not to directly ask that question, when counsel clearly could have given the scope of the court's ruling. Thus, there was no error and Luna's right to confrontation was not violated.

(MCOA Op. at 8-10.)

The Michigan Court of Appeals also denied Petitioner's Confrontation Clause claim

that the trial court erred by refusing to impeach Sylvia Garces with prior inconsistent statements on

her recorded police interviews, under plain error, as follows:

Luna next contends that the trial court erred by refusing to admit tapes of [Garces'] prior interviews as impeachment evidence. In addition, Luna claims that the court's ruling violated Luna's right to confrontation because "her knowledge of and fluency of [the] English [language] was never tested before the jury." We disagree. We review the trial court's decision to disallow the tapes as impeachment

- 26 -

evidence for an abuse of discretion. *Washington, supra* at 670, 664 NW2d 203. Further, because counsel did not object on confrontation grounds, our review of that sub-issue is for plain error affecting defendant's substantial rights. *McPherson, supra* at 138, 687 NW2d 370.

Typically, a witness' prior inconsistent statements are permitted for impeachment purposes.  MRE 613(b) provides, in part:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Here, defense counsel anticipated impeaching [Garces'] testimony with prior recorded police interviews.  Counsel asked the trial court for guidance regarding the admission of these tapes and their use to refresh her recollection because, if every single tape were played, it would "become a very long and arduous process."  The trial court responded, "[I]f it's going to be used for the purpose of refreshing her memory, it certainly is not appropriate to play them in the presence of the jury."  Counsel indicated that he would like to "reflect on this" over a recess.  When trial resumed, defense counsel continued his cross-examination of [Garces] and, a few minutes into the examination, indicated that he would like to play a tape for the jury in order to refresh [Garces'] memory.  The prosecutor objected, indicating that defense counsel could call the detective to the stand.  The trial court indicated that it would sustain the prosecutor's objection on those grounds, to which defense counsel replied:

> All right.  Then let me make this clear.  At this point in time, Your Honor, I'm asking to either allow her to listen to her interview to refresh her memory, in or out of the presence of the jury, or, in the alternative, I'm asking to allow the jury to hear that portion of this interview that is on an audio cassette tape that was provided by the Holland Police Department.

The court ruled that the tapes could be played outside the presence of the jury consistent with defense counsel's request.

Given the foregoing, it is plain that defense counsel abandoned his attempt to admit the tapes as impeachment evidence.  Rather, he sought to admit them solely for the purpose of refreshing [Garces'] recollection and specifically requested that they be played outside the presence of the jury for purposes of refreshing her

recollection. The trial court granted defense counsel's request.  Further, because counsel abandoned his attempt to admit the tapes as impeachment evidence, the trial court made no ruling on the issue and there is no ruling for this Court to review. Thus, it cannot be said that the trial court erred.

We also fail to see why the trial court's alleged error in refusing to admit the tapes for impeachment purposes violated Luna's right to confrontation.  According to Luna, the tapes would have demonstrated [Garces'] understanding of the English language.  Luna, however, has failed to explain how this information would have tended to impeach her testimony.  In any case, her knowledge of the English language was revealed to the jury during her testimony:  She was provided an interpreter, but sometimes answered in English, and defense counsel was permitted to cross examine her in English.  Thus, we consider this argument abandoned.  *Badiee v Brighton Area Schools,* 265 Mich App 343, 357, 695 NW2d 521 (2005).

(*Id.* at 10-11.)[4]

Respondent contends that Petitioner's claims are procedurally defaulted because they were not preserved by Petitioner's attorney through contemporaneous objections.  (Resp't's Answer, docket #17, Page ID##213-214, 222.)  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker,* 501 U.S. 797, 801 (1991); *Engle v. Isaac,* 456 U.S. 107

---

[4]Petitioner does not argue in his amended petition that the trial court erred by refusing to admit Garces' police tapes as impeachment evidence.  Even if he did, his claim is not cognizable on federal habeas review.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire,* 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell,* 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour,* 224 F.3d at 552 (6th Cir. 2000).  Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman,* 221 F.3d 846, 860 (6th Cir. 2000).  Petitioner has not met this difficult standard.

- 28 -

(1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim.  *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claims.  A state law procedural rule is adequate and

independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). Moreover, a rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster v. Adams*, 324 F.3d 423, 437 (6th Cir. 2003); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Further, even when, as here, the appellate court reviews the issue for plain error, the failure to object is still considered a procedural default. *See Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (holding that "plain error review does not constitute a waiver of state procedural default rules"); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (same under review for "manifest injustice").

Because Petitioner's claims are procedurally barred, he must demonstrate either cause excusing his default and actual prejudice or that the lack of habeas review will result in manifest injustice. *See House*, 547 U.S. at 536. To show cause sufficient to excuse his default, Petitioner must point to "some objective factor external to the defense" that prevented him from complying with the state procedural rule. *See Murray*, 477 U.S. at 488; *McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Factors that may establish cause include interference by officials, attorney error rising to the

level of ineffective assistance of counsel, and a showing that the factual or legal basis for a claim was not reasonably available. *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004) (citing *McClesky*, 499 U.S. at 493-94 (quotations omitted))). Petitioner has not explained his failure to object to the testimony of witnesses Sanchez and Garces or his failure to request the trial court to admit the tapes of Garces' police interviews as impeachment evidence.[5] He therefore fails to demonstrate cause excusing his procedural default. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Finally, Petitioner provides absolutely no new evidence concerning his actual innocence. He therefore cannot demonstrate manifest injustice caused by the procedural default.

In summary, Grounds II and III are procedurally defaulted and may not be reviewed by this Court.

### III.    Ground IV:  Equal Protection Clause and Due Process Clause

In his fourth ground for habeas corpus relief, Petitioner argues that he was denied free translation of his transcripts into Spanish, in violation of the Equal Protection Clause and the Due Process Clause.

---

[5]In Petitioner's reply to Respondent's answer, Petitioner states that he requested to return to state court to raise unspecified claims of ineffective assistance of trial and appellate counsel as well as claims of newly-discovered evidence but the Court denied his Motion to Stay Proceedings (docket #10) and Motion for Reconsideration (docket #11). (Pet'r's Reply to Resp't's Answer, docket #34, Page ID#249.) This Court denied both motions because Petitioner failed to satisfy the requirements under *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005) despite two attempts to do so. *See Rhines*, 544 U.S. at 277-78 (a court should grant a motion to stay a habeas action should be granted only where: (1) the petitioner has demonstrated good cause for his failure to exhaust the claims at issue; (2) the unexhausted claims are potentially meritorious; and (3) the petitioner has not engaged in intentionally dilatory litigation tactics.)

The Michigan Court of Appeals denied Petitioner's claim as follows:

Luna next asserts that the trial court erred by denying his post-trial motion for trial transcripts prepared in the Spanish language.  He contends that denial of the transcripts in Spanish has denied him equal protection of the law.  We disagree.

The Equal Protection Clause requires that the government treat all similarly situated persons alike.  *El Souri v Dep't of Social Services*, 429 Mich 203, 207, 414 NW2d 679 (1987)[.]  Here, Luna has failed to show that the applicable court rule, MCR 8.108,[4] treats similarly situated persons, in this case, convicted defendants, differently.  Rather, this rule, in our view, treats all guilty defendants alike:  each of them may receive a transcribed copy of the proceedings in English, which ensures their right to access the courts.  Significantly, nothing in the language of the rule evinces a discriminatory intent toward a particular group of persons nor does it deny any persons access to the courts.  Accordingly, relief is not warranted on this basis.

[4.] MCR 8.108(E) and (F)(1) provides:

(E) Furnishing Transcript.  The court reporter or recorder shall furnish without delay, in legible English, a transcript of the records taken by him or her (or any part thereof) to any party on request. The reporter or recorder is entitled to receive the compensation prescribed in the statute on fees from the person who makes the request.

(F) Filing Transcript.

(1) On order of the trial court, the court reporter or recorder shall make and file in the clerk's office a transcript of his or her records, in legible English, of any civil or criminal case (or any part thereof) without expense to either party; the transcript is a part of the records in the case.

(MCOA Op. at 11-12.)

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412.  Petitioner argues that the Supreme Court's holding in *Griffin v. Illinois*, 351 U.S. 12, 19 (1956), applies to provide indigent defendants with free transcripts in their native language.  (Pet'r's Reply to Resp't's Answer, docket #34, Page ID##252-53.)  The Supreme Court in *Griffin*, however, held that only *indigent* prisoners are entitled to free transcripts.  *Id.  Griffin* does

not specifically hold that indigent prisoners are entitled to free transcripts in their native language. Petitioner received a free trial transcript in accordance with *Griffin*, albeit in English.  Petitioner, however, cites no Supreme Court case holding that equal protection or due process mandates that indigent prisoners be provided with a translation of their transcripts in their native language.  In the absence of clearly established Supreme Court precedent, Petitioner cannot show that the appellate court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  August 29, 2014                     /s/ Ellen S. Carmody
                                                            ELLEN S. CARMODY
                                                            United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).

- 33 -